FILED

2014 May-12  PM 05:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **BILL FITZGIBBONS, LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:14-CV-268-VEH** |
| | ) |
| **REV BIRMINGHAM, INC., et al,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION AND ORDER

This civil action was originally filed in the United States District Court for the Western District of Texas, San Antonio Division, by the plaintiff, Bill Fitzgibbons, LLC, against the defendants, REV Birmingham, Inc. ("REV"), Mayer Electric Supply Company, Inc. ("Mayer"), and Nancy Collat Goedecke. (Doc. 1). Against Goedecke and Mayer, the complaint alleges tortious interference with a business relationship (Count One), federal unfair competition (Count Two), and unjust enrichment (Count Three). Against REV, the complaint alleges federal unfair competition (Count Two), and unjust enrichment (Count Three). Against all three defendants, the complaint alleges a civil conspiracy "to commit a substantive tort against FitzGibbons." (Doc. 1 at 15) (Count Four). All claims arise out of the parties' involvement with the creation of "light sculptures" to be installed in several railroad underpasses in

downtown Birmingham.

The case was transferred to this court pursuant to 28 U.S.C. § 1404(a). It now comes before the court on a motion to dismiss filed by Mayer and Goedecke (doc. 22), and a motion to dismiss filed by REV (doc. 33). Both motions argue that the complaint should be dismissed, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted. The plaintiff has filed two opposition briefs in response to the motions and, in both, moves the court to allow it to amend the complaint should the court deem the complaint to be insufficient. (Doc. 36 at 11; doc. 40 at 10). In the reply brief it filed to its motion to dismiss, REV has moved the court to strike "Exhibit A" to the plaintiff's brief in opposition to its motion to dismiss. (Doc. 42 at 2, 6-7).

For the reasons stated herein, REV's motion to strike will be **GRANTED**, the motions to dismiss will be **DENIED without prejudice**, and the plaintiff's motion to amend will be **GRANTED**.

## I.    STANDARD

"[A] court should only grant a motion to dismiss [under Rule 12(b)(6)] where the defendant demonstrates that the plaintiff cannot prove any set of facts in support of his claim which would entitle him to relief." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). "Moreover, when ruling on a motion to

dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded <u>facts</u> [and reasonable inferences drawn from those facts] as true." *Id.* (emphasis added). A court looks to the facts alleged in the plaintiff's complaint, and not its merely conclusory statements, when ruling on a motion to dismiss. Thus, to survive a motion to dismiss for failure to state a claim, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964–65, 167 L. Ed. 2d 929 (2007) (quotations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965. Mere conclusory statements in support of a threadbare recital of the elements of a cause of action will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

## II.   ALLEGATIONS IN THE COMPLAINT

The complaint alleges, in pertinent part:

10. FitzGibbons is an internationally known light artist that creates unique light sculptures that are site-specific for physical structures. His artwork is normally large scale lighting of a public structure to enhance the entire area to make the area a very desirable place for the public.

11. In addition to being internationally known as a light artist creating light sculptures, FitzGibbons has completed numerous public art

projects throughout the United States, and in foreign countries.

12. Some examples of the awards received by FitzGibbons for his work as a light artist creating light sculptures includes the following:

>   (a) Being named "Texas State Artist" by the Texas Legislature in 2012;

>   (b) Being a visiting Fulbright Scholar in Hungary;

>   (c) Recognition of his Day Star Arch in Art in Americas – 2000-2001 Public Art Review;

>   (d) Forthcoming spring cover story in National Art Magazine Art Voices;

>   (e) Cover story in LEDs Magazine for the LightRails project; and

>   (f) Will be featured in the next issue of Du Coté Chez Vous, a design magazine published in Paris, France.

13. Because of FitzGibbons' international reputation as a light artist providing light sculptures, in October 2012, Atticus Rominger, Chief Public and Investor Relations Officer of REV Birmingham, contacted FitzGibbons in San Antonio, Texas about providing a light sculpture for one of the underpasses in Birmingham. In addition to providing a Google map link of the particular underpass, Rominger stated the following:

>   I think there is great potential for future projects if we can get this one off the ground.

14. After reviewing the proposed underpass to receive the light sculpture, FitzGibbons responded, indicating that such a light sculpture "would be a dynamic transformative public art installation that would receive national attention."

4

15. After a conference call with FitzGibbons in San Antonio, Texas that included employees of the City of Birmingham and REV Birmingham, a site inspection of the underpass was arranged. Immediately prior to the site inspection, Rominger sent out an email dated January 28, 2013 indicating that "Light Artist" FitzGibbons will be coming from San Antonio, Texas to Birmingham, Alabama for a tour of potential sites for light installations. A notice was also sent to employees of the City of Birmingham.

16. On January 31, 2013, FitzGibbons flew from San Antonio to Birmingham and met with the following people, plus others:

> (a)   David Fleming, Chief Executive Officer of REV Birmingham;
> (b)   Kate Nielson, President of the Community Foundation of Greater Birmingham; and
> (c)   Bonner Wagnon, Public Director of the Cultural-Alliance.

17. Four underpasses were inspected for what was later named the "LightRails" project. FitzGibbons was told by Rominger if the project on the first underpass was successful, REV Birmingham would like to do the other three underpasses, which had similar structural elements to be equipped with similar LightRails.

18. On February 8, 2013, FitzGibbons sent a proposal for a light sculpture on the 18th Street underpass. On February 11, 2013, Rominger requested FitzGibbons to think about proposals for all four underpasses.

19. The proposal submitted to REV Birmingham by FitzGibbons on February 8, 2013 stated:

> It is understood that this artwork will come on line as pilot project with the goal of creating similar artworks at the 14th, 19th and 20th Street underpasses.

20. After some discussion of a timeline, REV Birmingham and

FitzGibbons entered into a contract.

21. On March 15, 2013, the City of Birmingham was contacted by REV Birmingham to get the City to provide dedicated electrical circuits to power to the soon-to-be installed light sculpture at the 18th Street underpass. The City of Birmingham subsequently provided the dedicated circuits, which were paid for by the taxpayers of Birmingham.

22. The timeline proposed for the light sculpture at the 18th Street underpass was very tight. FitzGibbons put aside other paying work to be able to complete the LightRails project on the schedule requested by REV Birmingham.

23. During the completion of the project at the 18th Street underpass, various names were suggested for the light sculpture until settling on the term "LightRails".

24. While FitzGibbons was completing the light sculpture at the 18th Street underpass, FitzGibbons was asked by Rominger of REV Birmingham to donate his lights and his services for a one-night fundraiser event in Birmingham for the Red Cross called Paint the Town Red. FitzGibbons complied with the request.

25. REV Birmingham wanted the LightRails project completed in four months by June 27, 2013, which was a very difficult schedule to meet. Typically, such a project would take 12 to 15 months to complete.

26. In May 2013, Rominger suggested to FitzGibbons that the lighting fixtures be purchased from Nancy Goedecke and/or her company Mayer Electric. Rominger stated Goedecke owned Mayer Electric, a large electrical supply company in the State of Alabama.

27. FitzGibbons informed Rominger/REV Birmingham that he purchased the ColorKinetics fixtures he used directly from the manufacturer. Because the ColorKinetics fixtures were sold directly by the manufacturer to FitzGibbons, the price FitzGibbons paid for the fixtures was the same price that would have been paid by Mayer Electric. There was no markup in the price of the ColorKinetics light

fixtures provided by FitzGibbons.

28. At the time that Rominger suggested the light fixtures be purchased from Mayer Electric, Goedecke was (a) a member of the Board of Directors of REV Birmingham and (b) Chairman and CEO of Mayer Electric.

29. Rominger ignored Goedecke's conflict of interest . . . when attempting to get FitzGibbons to buy the light fixtures from Goedecke's company, Mayer Electric.

30. Despite the statements by FitzGibbons that he purchased directly from the factory, Chris Hatcher with REV Birmingham sent an email to Goedecke indicating:

> Someone with S and W [Electric] will be call [sic] Mayer within the next few days to discuss the supply list with you.

31. The grand opening of the light sculpture created by FitzGibbons at the 18th Street underpass occurred on July 27, 2013. The light sculpture project was branded and promoted as "LightRails[.]" Thousands of invitations were sent by REV Birmingham, inviting people to the Grand Opening of "LightRails" on July 27, 2013.

32. At the grand opening of "LightRails," the Mayor of Birmingham, city officials from Birmingham, REV Birmingham and other dignitaries spoke lavishly about "LightRails". [sic] The "LightRails" project was reported widely in the media in Birmingham and throughout the United States.

33. As a result of the "LightRails" project designed, built and installed by FitzGibbons, numerous glowing reports have appeared, not only throughout the United States, but throughout the world. Just some of the many favorable articles are attached hereto.

34. After the grand opening of "LightRails" on June 27, 2013, hundreds (maybe even thousands) of items have appeared on the Internet praising the "LightRails" project.

35. The "LightRails" project designed, created and installed by light artist FitzGibbons gives a very favorable image of the City of Birmingham. That favorable impression of the City of Birmingham created by LightRails could not have been purchased with advertising dollars. The "LightRails" project designed by light artist FitzGibbons is a very fundamental part of the revitalization of downtown Birmingham.

36. While REV Birmingham promotes itself as a "private-public partnership," the "LightRails" project was paid for at least in part by the taxpayers of the City of Birmingham.

37. On June 26, 2013, one day before the grand opening of the "LightRails" project, Rominger requested FitzGibbons in San Antonio, Texas to begin preparation for a "LightRails" project at the 14th Street underpass in Birmingham, a similar type structure. Pursuant to that request, extensive measurements and photographs were made of the 14th Street underpass. FitzGibbons recommended interactive components for pedestrians at the 14th Streed underpass. . . . Rominger and Chris Hatcher of REV Birmingham responded that this was a great idea. Therefore, FitzGibbons began to investigate an interactive component.

38. On July 10, 2013, Rominger asked FitzGibbons to do a proposal for the 14th Street underpass. Also, Rominger asked what particular fixtures to use, how much they would cost, and what kind of switches FitzGibbons would specify for the other "LightRails" projects, including the 14th Street underpass. FitzGibbons provided the requested information on the LED fixtures and continued research for appropriate switches for REV Birmingham.

39. Rominger, on behalf of REV Birmingham, also asked FitzGibbons for media contacts that would help REV Birmingham in their fundraising efforts. FitzGibbons provided REV Birmingham with the media contacts.

40. During the grand opening of the "LightRails" project, Hatcher of REV Birmingham, set up a meeting between Nancy Goedecke and FitzGibbons at his hotel shortly before leaving Birmingham, Alabama

for a flight back to San Antonio, Texas.

41. The meeting occurred on the morning of June 28, 2013 and was attended by Rominger of REV Birmingham, Nancy Goedecke, a Director of REV Birmingham and Chairman of the Board of Mayer Electric, one of Mayer Electric's employees and FitzGibbons.

42. At the meeting, Goedecke was upset because FitzGibbons did not purchase the light fixtures from Mayer Electric. FitzGibbons explained to Goedecke that he purchased the light fixtures directly from the manufacturer at the same price the fixtures could be purchased by Goedecke and/or Mayer Electric. Additionally, FitzGibbons (individually) is a sole employee of Bill FitzGibbons, LLC and, hence, has lower overhead costs than Mayer Electric. The meeting concluded with Goedecke stating, "It looks like we are competitors," or words to that effect.

43. Goedecke ignored the conflict of interest that she had between her position as (a) a Director of REV Birmingham and (b) as Chairman of the Board and Chief Executive Officer of Mayer Electric when she demanded to know why the ColorKinetics light fixtures had not been purchased from her company.

44. Based upon information and belief, the conduct of Goedecke, Mayer Electric and/or REV Birmingham violates the Alabama Ethics Act.

45. To prove FitzGibbons was supplying the light fixtures at FitzGibbons' cost, invoices reflecting those costs were confidentially provided by FitzGibbons to REV Birmingham.

46. Based upon information and belief, everything provided to REV Birmingham, including, but not limited to, (a) cost of the light fixtures, (b) proposals for the 14th Street underpass, and (c) designs and programs of the 18th Street underpass were all provided to Goedecke and/or Mayer Electric with the objections of FitzGibbons.

47. On November 21, 2013, Rominger called FitzGibbons and informed

him that REV Birmingham was not going to hire FitzGibbons for the next three underpasses previously discussed, but REV Birmingham was going to go local.

48. Based upon information and belief, because Mayer Electric has an exclusive area distributorship in Alabama for ColorKinetics fixtures. Hence, going local means that Goedecke and/or Mayer Electric will be providing the ColorKinetics light fixtures for the remaining three LightRails projects.

49. Based upon information and belief, information received from FitzGibbons, some of which was confidential, has been provided to Goedecke so that Goedecke and/or Mayer Electric with others (currently unknown) will be able to install the other proposed "LightRails" projects.

50. Further, based upon information and belief, the other "LightRails" projects are going to be copying FitzGibbons' artistic creation for the 18th Street underpass to provide similar LightRails for the other three similar underpasses.

51. Based upon information and belief, the public is being misled, and will continue to be misled, into believing that FitzGibbons designed, created and installed all four underpasses, when such is not true.

52. The designing and creation of the LightRails project by FitzGibbons occurred in San Antonio, Texas. Communications concerning the LightRails project were received in, or sent from, San Antonio, Texas. FitzGibbons signed the contract in San Antonio, Texas and was paid in San Antonio, Texas.

(Doc. 1 at 3-11).

## III.   ANALYSIS

### A.   <u>Choice of Law</u>

As noted above, against Goedecke and Mayer, the complaint alleges the Alabama state law claim of tortious interference with a business relationship (Count One), federal unfair competition (Count Two), and the Alabama state law claim of unjust enrichment (Count Three). Against REV, the complaint alleges federal unfair competition (Count Two), and the Alabama state law claim of unjust enrichment (Count Three). Against all three defendants, the complaint alleges a civil conspiracy, under Alabama law, "to commit a substantive tort against FitzGibbons." (Doc. 1 at 15) (Count Four). All defendants move to dismiss all counts. The court will address both motions to dismiss at the same time.

Since this case was transferred from a federal court sitting in Texas, this court uses Texas choice-of-law rules to determine whether Texas or Alabama law applies to the state law claims. *Am. Family Life Assur. Co. of Columbus, Ga. v. U.S. Fire Co.*, 885 F.2d 826, 832 (11th Cir. 1989) ("The substantive law that applies in a suit originally brought in Missouri and transferred by the defendant or by the court under 28 U.S.C.A. § 1404(a) to Georgia should be determined according to Missouri's choice-of-law rules."). "Texas uses the *Restatement's* 'most significant relationship' test to decide choice-of-law issues." *Ins. Co. of State of Pennsylvania v. Neese*, 407

S.W.3d 850, 853 (Tex. App. 2013) (internal quotations omitted).[1] The parties agree

---

[1] The Texas Supreme Court has noted:

For tort suits, the "most significant relationship" test involves at least two levels of analysis. The first level, as stated in section 6 of the Restatement (Second) of Conflict of Laws, involves a general test: the weighing of the competing policy interests of the different jurisdictions. *Vanderbilt Mortg. & Fin., Inc. v. Posey,* 146 S.W.3d 302, 314 (Tex.App.-Texarkana 2004, no pet.). Section 6 requires consideration of

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2).

The second level of analysis provides additional guidance concerning a specific area of law. *Posey,* 146 S.W.3d at 314. Section 6 "sets out the general principles by which the more specific rules are to be applied." *Gutierrez,* 583 S.W.2d at 318–19. In a tort case, section 145 provides a more specific rule. *Id.* at 319. Section 145 emphasizes the four factors:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.

that Alabama has the most significant relationship to this case. (Doc. 22 at 9; doc. 33 at 5; doc. 36 at 3; doc. 40 at 3). The court agrees as well.[2] Alabama substantive law applies to the state law claims.

### B.   Count One – Tortious Interference with a Business Relationship (Goedecke and Mayer)

Count One alleges that Goedecke and Mayer, tortiously interfered with the business relationship between the plaintiff and REV. To establish the tort of interference with contractual or business relationships a plaintiff must prove: "(1) the

---

Restatement (Second) of Conflict of Laws § 145(2).

Another level of analysis may be directed by other sections of the Restatement where there is a specific context within the area of law. *Posey,* 146 S.W.3d at 315. Texas courts have often applied more specific sections of the Restatement to address particular choice of law issues. *Hughes,* 18 S.W.3d at 206 n. 2 (holding section 184 of the Restatement provides the "standards by which a court is to determine immunity from a tort suit when an employee is covered by workers' compensation insurance").

Ins. Co. of State of Pennsylvania v. Neese, 407 S.W.3d 850, 853-54 (Tex. App. 2013).

[2] As noted by Goedecke and Mayer in their motion:

All of [the Section 145] factors counsel in favor of application of Alabama law on [p]laintiff's state law claims--all defendants reside in Alabama; the relationship between the parties is centered in Alabama; the Project is located in Alabama; future projects, if any, will be located in Alabama; and any alleged conduct causing [p]laintiff injury occurred, if anywhere, in Alabama. Moreover, [p]laintiff's "injury" occurred, if at all, in Alabama since the "business relationship" at issue was centered there, and, according to [p]laintiff, it was where the defendants allegedly conspired against it and became unjustly enriched. It follows that Alabama law should be applied to [p]laintiff's claims.

(Doc. 22 at 9).

13

existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009) (emphasis added); *see also, Alabama Psychiatric Servs., P.C. v. A Ctr. for Eating Disorders, L.L.C.*, 1110703, 2014 WL 272338 at * 4 (Ala. Jan. 24, 2014) (same). The defendants argue that this claim must be dismissed because they are not "strangers" to the business relationship between the plaintiff and REV.

  a. ***The Standard for Determining Whether a Party Is a "Stranger" to the Business Relationship***

 *Parsons & Whittemore Enterprises Corp. v. Cello Energy, LLC ("Cello")*, 613 F. Supp. 2d 1271, 1281-85 (S.D. Ala. 2009) provides an excellent summary and discussion of the standard, and cases which have applied it. In *Cello*, Judge Granade wrote:

  In Alabama, a "party to a particular contract[3] cannot, as a matter

---

 [3] The opinion in *Cello,* and many other cases discussing this Alabama tort, use the word "contract", and the phrase "contractual relations" when discussing the "stranger" issue.  It is noted that the same cases, while discussing this issue, will sometimes also use the word "business" and the phrase "business relations." No inference should be drawn therefrom as, since 1986, there has been but one "combined" tort in Alabama for intentional interference with business or contractual relations. *See, Gross v. Lowder Realty Better Homes & Gardens*, 494 So. 2d 590, 597 (Ala. 1986) *overruled on other grounds by White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5 (Ala. 2009) ("[W]e announce a new rule in this state broad enough to encompass both interference with business relations and interference with contractual relations[.]"); see also, Orrin K. Ames III, *Tortious Interference with Business Relationships: The Changing Contours of This Commercial Tort*, 35 Cumb. L. Rev. 317, 327 (2005). The "stranger" rules apply in both the contract and business relations contexts. No party argues otherwise.

of law, be liable for tortious interference with that contract." *Bama Budweiser v. Anheuser–Busch,* 611 So.2d 238, 247 (Ala.1992). Likewise, a party to "[interdependent] contractual relations" with different "rights and duties between different sets of parties to a multiparty contract" cannot be liable for interference. *Ex parte Blue Cross & Blue Shield,* 773 So.2d 475, 480 (Ala.2000). The party asserting the tortious interference claim bears the burden of establishing that the party defending the claim "is a 'third party' or 'stranger' to the contract or business relationship with which the defendant allegedly interfered." *Waddell & Reed,* 875 So.2d at 1154.

The *Waddell & Reed* case explains various ways a defendant may be a party in interest to a business relationship. "A defendant is a party in interest to a relationship if the defendant has any beneficial or economic interest in, or control over, that relationship." *Id.*

> One is not a stranger to the contract just because one is not a party to the contract, as it has been held that the alleged interferer is not a stranger to the contract and thus not liable for tortious interference where the alleged interferer was the agent for one of the parties to the contract of insurance (i.e., the underwriter), and all the purported acts of interference were done within the scope of the interferer's duties as agent.

*Id.* (quotations omitted).

Further narrowing the category of parties that are subject to liability for this tort, [] *Waddell & Reed* went on to explain:

> that all parties to a comprehensive interwoven set of contracts which provided for the financing, construction, and transfer of ownership were not strangers, i.e., the purchaser of a radio station was not a stranger to the contractual relations between the radio station's seller and the seller's lenders. Thus, in order for a defendant to be liable for tortious interference with contractual relations,

15

the defendant must be a stranger to both the contract *and* the business relationship giving rise to and underpinning the contract.

*Id.* at 1154–55. (quotations omitted, emphasis in original). The court summarized as follows:

"[A] defendant is not a 'stranger' to a contract or business relationship when: (1) the defendant is an essential entity to the purported injured relations; (2) the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; (3) the defendant would benefit economically from the alleged injured relations; or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contracts or relations."

*Id.* at 1156 (citations omitted, alteration in original).

After setting out the foregoing summary, the court reiterated that a party cannot be liable for interference unless it is "a stranger to both the contract and the business relationship giving rise to and underpinning the contract." *Id.* at 1157. It further explained that "[a] person with a direct economic interest in the contract is not a stranger to the contract. Parties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships." *Id.* at 1157 (emphasis omitted). A defendant cannot be found liable for interfering with a contract as long as the defendant is essential to the allegedly injured relation "arising from interwoven contractual arrangements that include the contract." *Id.*

Alabama courts have applied this elaborate rule of law to find that Anheuser–Busch was a party to a contract between a party that purchased a beer distributorship and the party that sold the distributorship because the buyer and seller could not have completed the sale without Anheuser–Busch's approval, *Bama Budweiser*, 611 So.2d at 247; that an insurance company was a party to multiparty

16

contractual relations between a dentist and his insured patients because the dentist and his patients contracted together in reliance on the insurer's interdependent contractual obligation to pay for dental services, *Blue Cross & Blue Shield,* 773 So.2d at 480; and that a business-owner's father, who had no job title at the business, was not an owner or employee of the business, did not regularly work at the business, was not paid by the business, but who helped the business owner interview employees, fired at least two employees, helped his son find financing to purchase the business, described himself as the "agent" of the business, and informed employees that the business was not going to provide them with an agreed-upon equity interest in the business, could not be liable for interfering with the contract between the business and an employee he fired because he was acting as the agent of his son or of his son's business when he fired the employee, *Parsons v. Aaron,* 849 So.2d 932 (Ala.2002).

In *Bellsouth Mobility, Inc. v. Cellulink, Inc.,* 814 So.2d 203 (Ala.2001), the court found that a cell phone service and equipment supplier was a party to the contractual relationship between its sales agent and a retail store where the sales agent set up sales kiosks. The supplier and the sales agent entered into an agreement specifically addressing the sales agent's agreement with the retail store in which the supplier agreed to furnish the kiosks and to pay the rent due the retail store for the kiosks. *Id.* at 208–09. The sales agent agreed with the supplier that the sales agent would execute a lease with the retailer and assign the lease to the supplier if the sales agent ceased operating at the location covered by the lease. *Id.* at 209. Also, the agreement between the supplier and the sales agent included a clause in which the supplier agreed to pay the retailer a percentage of the sales that were made at the kiosk in the retailer's store. *Id.* at 209. The lease agreement that the sales agent executed with the retailer specifically provided that the supplier would pay the fixed rent and percentage commission due on the kiosks. *Id.*

After the agreement between the supplier and the sales agent was signed and the lease between the sales agent and the retailer was signed, the supplier entered into a separate agreement with the retailer which

allowed the supplier to staff kiosks at the retailer's stores with the supplier's own employees. *Id.* at 209–10. In the meanwhile, the sales agent was having trouble making its quotas with the supplier. *Id.* at 210. The retailer ordered the sales agent to vacate its kiosks at the retailer's stores pursuant to a 90–day cancellation clause in the lease. *Id.* at 209–10. The sales agent sued the supplier for interfering with the sales agent's relationship with the retailer. *Id.* at 210.

Although the supplier was not a party to the lease agreement between the sales agent and the retailer, the court found that the supplier could not be liable for interference based on the theory that, "[w]hen tripartite relationships exist and disputes arise between two of the three parties, then a claim alleging interference by the third party that arises from conduct by the third party that is appropriate under its contract with the other two parties is not recognized." *Id.* at 212 (quotations and citation omitted). Relying in particular on the *Bama Budweiser* case, the court held that the sales agent and the retailer could not have entered into their lease agreement without the supplier's approval, that the supplier was a party to every cell phone subscription that the sales agent sold from its kiosk at the retailer's store, and that the lease agreement with which the supplier allegedly interfered set out rights and obligations between the supplier and the retailer. *Id.* at 214. As a consequence, the supplier was not a stranger to the relationship between the sales agent and the retailer. *Id.*

More recently, the Supreme Court of Alabama applied the rule in *Tom's Foods, Inc. v. Carn,* 896 So.2d 443 (Ala.2004). In that case, a company called "Tom's Foods" had agreements with a company called "Dixie" for Dixie to distribute Tom's Foods products in vending machines. *Id.* at 446. Dixie financed some of its vending machines through Tom's Foods, pledging all of Dixie's vending machines, office equipment, trucks, inventory, and cash proceeds as collateral. *Id.* Tom's Foods assigned the notes and security agreements to Stephens Diversified Leasing, Inc., which eventually changed its name to "STI." *Id.* at 446–47. The assignment gave STI a right of recourse against Tom's Food if Dixie defaulted. *Id.* Later, Dixie leased additional vending machines from STI, which gave STI a right to repossess the equipment

if Dixie defaulted and precluded Dixie from transferring the machines without STI's consent. *Id.* at 447. Dixie acknowledged that Tom's Foods was STI's agent for enforcing the terms of the lease. *Id.*

Dixie defaulted on its obligations in late 1996. *Id.* STI asked Tom's Foods to repossess the vending machines, which Tom's Foods began to do on February 19, 1997. *Id.* 447–48. Duke learned about Dixie's problems and negotiated an oral agreement in February 1997 with Dixie to purchase Dixie's accounts and equipment. *Id.* at 448. Duke began servicing Dixie's customers while Duke was working to obtain financing in order to maintain the accounts. *Id.* at 448–49. Tom's Foods opposed Duke's activities, expressed its intent to repossess Dixie's vending machines, and began its repossession efforts. *Id.* at 449–50.

Duke accused Tom's Foods of interfering with its agreement with Dixie to purchase the vending machines. The Supreme Court of Alabama held that Tom's Foods was not a stranger to the agreement between Duke and Dixie. First, Tom's Foods, Dixie, and STI were parties to comprehensive, interwoven contracts that gave Tom's Foods an economic interest in the relationship between STI and Dixie. *Id.* at 455. Second, Tom's Foods was acting as STI's agent when it was repossessing Dixie's vending machines. *Id.* Third, Tom's Foods was not a stranger to the business relationship between Dixie and STI because Tom's Foods helped create that relationship. *Id.* Finally, Duke was acting as Dixie's agent when it was servicing Dixie's accounts with the vending machines at issue and "stood in Dixie's shoes and had no more right to retain the vending machines than did Dixie." *Id.* Based on "these facts, Tom's Foods, STI, Dixie, and Duke were all parties to an interwoven set of contracts and business relationships," precluding Tom's Foods' liability for interference. *Id.*

[In] *Peacock v. Merrill*, Civ. A. 05–377BHC, 2005 WL 2739138 (S.D.Ala. Oct. 24, 2005), . . . the court denied a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss an intentional interference with a business relationship claim. The plaintiff accused the defendants, who were "Directors, Managing Members, Officers, Members, and Shareholders and/or Interest Holders" of certain companies of acting in

"their individual capacities for their own benefit and on their own behalf" when they "fraudulently and improperly" purchased the plaintiff's interest in those companies, thereby "divesting [the plaintiff] of her interest in those companies." *Id.* at *1. The court found that, assuming the defendants were acting in their individual capacities when they committed their alleged misdeeds, they could be strangers to the plaintiff's relationship with the companies because "[a] shareholder's relationship with the company in which they maintain an interest ... is not inextricably intertwined or necessarily dependent on another individual's similar relationship with that company." *Id.* at *2.

*Cello*, 613 F. Supp. 2d at 1281-84.

> **b.** ***The One Sentence from the Complaint which the Defendants Cite Does Not Establish that the Defendants Are Parties to the Contract/Business Relationship between the Plaintiff and REV***

The complaint alleges that "Nancy Goedecke ignored a conflict of interest she had and unethically used her position on the Board of REV Birmingham to divert future *LightRails* projects to her company, Mayer Electric Supply Company, Inc., for her personal gain." (Doc. 1 at 2). The defendants argue only that this allegation defeats the plaintiff's claim, citing to the statement in *Waddell & Reed* that "'[a] defendant is a party in interest to a relationship if the defendant has any beneficial or economic interest in, or *control over*, that relationship.'" (Doc. 22 at 10 quoting *Waddell & Reed*, 875 So. 2d at 1154 (emphasis in document 22) (citing *Parsons,* 849 So.2d at 937; *BellSouth,* 814 So.2d at 214; *Colonial Bank v. Patterson*, 788 So. 2d 134, 139 (Ala. 2000) overruled by *White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So.

3d 5 (Ala. 2009); *Blue Cross,* 773 So.2d at 480); doc. 39 at 2).

It is undisputed that Goedecke and Mayer were <u>not</u> parties to the contract between the plaintiff and REV. Of course, that alone does not mean that they are necessarily strangers to the <u>business relationship</u> between the plaintiff and REV. However, the vague allegation that Goedecke "used her position on the board of REV" does not, alone, show that <u>she</u> was a party to the business relationship. The court notes that the statement provides the court with no <u>facts</u> as to what specifically was done.[4] The court also notes the following:

> – unlike in *BellSouth* or in *Bama Budweiser*, here there are no facts alleged indicating that the plaintiff and REV could not have entered into the agreement without Goedecke or Mayer's permission or approval.[5]

> – there are no facts alleged indicating that Goedecke and Mayer are essential entities to the purported injured relations;

> – unlike in *Blue Cross & Blue Shield*, here there are no facts alleged indicating that the plaintiff and REV contracted in reliance on some other duty to be

---

[4] The absence of facts is a problem throughout the complaint, and, while it appears to <u>help</u> the plaintiff as to this argument, as noted below, such absence ultimately dooms the intentional interference count as a whole, as well as the other counts of the complaint. However, at this point, the court limits its discussion to the narrow issue raised by the defendants.

[5] The court is aware of the allegation that Goedecke is a Board member of REV. However, there is no allegation that <u>she</u> had to approve of the arrangement or it would not have happened.

performed by Goedecke and/or Mayer, or that the allegedly injured relations are inextricably a part of or dependent upon Goedecke and Mayer's contractual or business relations with any party;

– there are no facts alleged indicating that Goedecke and/or Mayer benefitted economically from the relationship between the plaintiff and REV;

– unlike in *Tom's Foods*, here there are no facts alleged indicating that Goedecke, Mayer, the plaintiff, and/or REV are parties to "a comprehensive interwoven set of contracts or relations;" and

– there are no facts alleged indicating that Goedecke and/or Mayer were the agents of any party to the contract, and/or that they acted within the scope of any such agency.

For the reasons cited above, the court determines that Goedecke and Mayer are incorrect in their assertion that <u>the one sentence they cited</u> establishes that they are parties to the business relationship.

### 2. *As to This Claim, the* <u>**Twombly**</u> *and* <u>**Iqbal**</u> *Minimum Pleading Standards Have Not Been Met*

Despite the court's findings in the previous section, the court notes that <u>the burden is on the plaintiff</u> to establish that the party defending the claim "is a 'third party' or 'stranger' to the contract or business relationship with which the defendants

allegedly interfered." *Waddell & Reed*, 875 So.2d at 1154. Although this may only be an <u>evidentiary</u> burden,[6] it should be considered along with the requirements of *Twomby* and *Iqbal*.[7] In making its finding in the previous section, the court does not shift the burden to the <u>defendants</u> to prove that they <u>are</u> parties to the relationship. However, the posture of the <u>one</u> argument made by the defendants in their original motion constrained the court to what was alleged and was relevant to <u>that argument</u>. The defendants did <u>not</u> argue that Count Two failed to allege sufficient facts under *Twombly* and *Iqbal*. The court notes, however, that the count is deficient in that regard.

An example of one such deficiency is illuminated by the response the plaintiff made to the motion to dismiss. There, the plaintiff argues that Goedecke was not a party to the business relationship, even though she was a member of the board of REV, because she "acted outside the scope of her duties as a board member of REV Birmingham." (Doc. 36 at 4). The plaintiff points to allegations that:

> (1) REV Birmingham arranged a meeting between FitzGibbons, Goedecke, and an unnamed employee of Mayer Electric.

---

[6] The Supreme court has cautioned against confusing evidentiary burdens with pleading requirements. *See, Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510, 122 S. Ct. 992, 997, 152 L. Ed. 2d 1 (2002) ("The prima facie case under *McDonnell Douglas*, however, is an evidentiary standard, not a pleading requirement.").

[7] Indeed, the plaintiff acknowledges the burden on it in its opposition brief. (Doc. 36 at 4).

(2) At that meeting, Goedecke was upset because FitzGibbons did not purchase supplies from Mayer Electric for the first of the four LightRails underpasses.

(3) Goedecke ignored a conflict of interest between her position with REV Birmingham and her position as an officer of Mayer Electric.

(4) Goedecke stated, "It looks like we [i.e., Mayer Electric and FitzGibbons, LLC] are competitors."

(Doc. 36 at 4-5) (citing doc. 1 at ¶¶ 40-41, 42, 43). The plaintiff then writes:

Because the Complaint has sufficiently pleaded that Goedecke acted outside the scope of her duties as a REV Birmingham board member, and she was therefore a stranger to the relationship between FitzGibbons, LLC and REV Birmingham, the motion should be denied with respect to this claim.

(Doc. 36 at 5).[8]

The court does not agree that the complaint "has sufficiently pleaded that Goedecke acted outside the scope of her duties as a REV Birmingham board member." First, the complaint contains no fact which describes the nature of those duties, so it is impossible to say that it has pled facts which show that she acted outside the scope of them. Second, even if the complaint had pled the nature of Goedecke's duties as a member of the board, it does not say what she <u>did</u> that was outside the scope of those duties other than to vaguely state that she "ignored a conflict of interest." Accordingly, the court cannot say that she was not an agent of

---

[8] This is the entire argument the plaintiff makes as to this count.

24

REV when she did <u>whatever it is that she is supposed to have done.</u>

The failure to allege that Goedecke did <u>anything</u> is fatal both to this argument and to Count One as a whole. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964–65, 167 L. Ed. 2d 929 (2007) (quotations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965. Mere conclusory statements in support of a threadbare recital of the elements of a cause of action will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). However, Goedecke and Mayer did not include this as a reason that this count should be dismissed, and so the plaintiff has not had an opportunity to respond to it.[9]  In any event, the point is moot as the court will allow the plaintiff an opportunity to amend this count.

### C.   <u>Count Two – Unfair Competition (REV, Goedecke, and Mayer)</u>

Against all three defendants, the plaintiff attempts to make a claim for "passing

---

[9] They discussed this reason in their reply, but only in connection with the agency issue. *See,* doc. 39 at 3.

off" under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).[10] The

Eleventh Circuit has explained:

> [A] false designation of origin claim, which proscribes the behavior of "passing off" or "palming off," . . . "occurs when a producer misrepresents his own goods or services as someone else's." *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 28 n. 1, 123 S.Ct. 2041, 2045, 156 L.Ed.2d 18 (2003). To establish a prima facie case under § 1125(a), a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it "such that consumers were likely to confuse the two." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.,* 106 F.3d 355, 358 (11th Cir.1997); *see SunAmerica Corp. v. Sun Life Assurance Co. of Canada,* 77 F.3d 1325, 1334 (11th Cir.1996).

*Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647-48 (11th Cir.

2007).

### 1. *There Is No Allegation of Enforceable Trademark Rights*

---

[10]That statute provides:

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C.A. § 1125 (a)(1)(A).

Nowhere in the complaint is there even a <u>conclusory allegation</u> that the plaintiff has "enforceable trademark rights" in <u>anything</u>. No facts are alleged from which an inference of such rights can be made. The plaintiff's responses to the motions to dismiss make no attempt to argue that the plaintiff has any such rights. For those reasons, the count fails to state a claim upon which relief may be granted.[11]

To the extent that his initial contribution to the LightRails project is the "thing" in which the plaintiff has enforceable trademark rights, and the alleged violation is "copying," the contract in this case[12] reveals that the plaintiff may not have any such rights. It provides that REV "shall have ownership and possession" of the project, and may "make any and all reproductions or derivatives in whatever form," for "any . . .

---

[11] On April 24, 2014, the plaintiff filed a two page "supplement" to its responses to the motions to dismiss to which it attached a copy of the United States Supreme Court's recent decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). (Doc. 44 at 1). The Court issued the decision <u>after</u> the plaintiff responded to the motions. The plaintiff does so purportedly in an attempt, for the first time, to respond to the claim that it has no enforceable trademark interest. (Doc. 44 at 1). First, *Lexmark* is clear that "[s]ection 1125(a) . . . creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Lexmark*, 134 S. Ct. at 1384. In that case, the Supreme Court addressed <u>only</u> the issue of standing, and then only in the context of a <u>false advertising</u> claim. *Id.* at 1390 ("[T]o come within the zone of interests in a suit for <u>false advertising</u> under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales."). The instant case deals with only <u>false association</u>, and the issue is <u>not</u> one of standing. Other than to note that *Lexmark* "appears to overrule many years of precedent" (doc. 44 at 2), the plaintiff does not explain how *Lexmark* is helpful. In summary, the <u>complaint</u> still does not <u>allege</u> enforceable trademark rights.

[12] The contract may be considered in deciding the Rule 12(b)(6) motions because it is an attachment to the complaint and is also central to the plaintiff's claims. *Starship Enterprises of Atlanta, Inc. v. Coweta Cnty., Ga.*, 708 F.3d 1243, 1253 n. 13 (11th Cir. 2013).

purpose." (Doc. 1-3 at 7, at § 11.0). Although this point was raised by the defendants, the plaintiff has failed to address it in its opposition briefs.

### 2.    *None of the Defendants Can Be Liable under the Lanham Act for Misappropriation of Confidential Information*

Count Two alleges:

60. . . . The LightRails project contained confidential information of FitzGibbons that was provided to REV Birmingham, who in turn provided the confidential information to Goedecke and/or Mayer Electric.

61. The confidential information includes the details on the structure and programming of the light fixtures on the 18th Street underpass, including, but not limited to, how much each of the fixtures cost, the switches to be used, and the lighting sequence. All of this was provided by FitzGibbons to REV Birmingham under an expectation of privacy.

62. The information provided by FitzGibbons to REV Birmingham is not generally known in the trade or by the public, and cannot be derived from publically available information. The information provided by FitzGibbons to REV Birmingham was provided under circumstances to reasonably expect REV Birmingham to maintain its confidentiality. Also, the information provided to REV Birmingham has economic value to FitzGibbons.

63. Based upon information and belief, the confidential information provided by FitzGibbons to REV Birmingham was in turn provided to Goedecke, who has a conflict of interest between her positions (a) on the Board of Directors of REV Birmingham and (b) as Chairman and CEO of Mayer Electric.

(Doc. 1 at 12).

These paragraphs <u>seem</u> to allege[13] a Lanham Act claim based on REV improperly giving to Goedecke and Mayer, and Goedecke and Mayer improperly accepting, confidential information which the plaintiff gave to REV. However, the plaintiff has not cited, and this court has not found, any authority for the proposition that there is a cause of action under the Lanham Act for misappropriation of confidential information. At least one court which has considered the issue has determined that there is not. *See, Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1287 (S.D. Fla. 2001) ("[T]he Lanham Act does not concern itself with the question of whether an item is in the public domain or with the related question of whether the item is a trade secret." ); *Potucek v. Taylor*, 738 F.Supp. 466, 469–70 (M.D.Fla.1990).

Even if the Lanham Act provides a remedy for misappropriation of confidential information, the complaint does not allege that the information <u>was</u> in fact given to Goedecke and Mayer. It states only that "[b]ased upon information and belief," it was given to them. (Doc. 1 at ¶46 ("Based upon information and belief, everything provided to REV Birmingham, including, but not limited to, (a) cost of the light fixtures, (b) proposals for the 14th Street underpass, and (c) designs and programs of

---

[13] The exact basis of the Lanham Act claim is unclear, as this count appears to set out many different types of conduct. The court will address each different allegation of conduct separately.

the 18th Street underpass were all provided to Goedecke and/or Mayer Electric with the objections of FitzGibbons."), ¶ 49 ("Based upon information and belief, information received from FitzGibbons, some of which was confidential, has been provided to Goedecke so that Goedecke and/or Mayer Electric with others (currently unknown) will be able to install the other proposed "LightRails" projects."), ¶ 63 ("Based upon information and belief, the confidential information provided by FitzGibbons to REV Birmingham was in turn provided to Goedecke[.]")). It has been noted, and this court agrees, that:

> [t]he *Twombly* plausibility standard . . . does not prevent a plaintiff from "pleading facts alleged 'upon information and belief' " where the belief is based on factual information that makes the inference of culpability plausible. *See Iqbal,* 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") The *Twombly* Court stated that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]." 550 U.S. at 556.

*Associated Indus. Ins. Co., Inc. v. Advanced Mgmt. Servs., Inc.*, 12-80393-CIV, 2013 WL 1176252 at * 3 (S.D. Fla. Mar. 20, 2013). However, here there is no inference based upon facts in the complaint, only a conclusion that the information was given

by REV to Goedecke and Mayer.[14]

### 3.     *The Lanham Act Creates No Cause of Action for Copying*

Count Two also alleges in part:

64.     Based on information and belief, REV Birmingham, Mayer Electric and/or Goedecke are continuing the "LightRails" project for three additional underpasses essentially duplicating the efforts of internationally-known light artist FitzGibbons. Each of the underpasses is similar in structure, and REV Birmingham/Mayer Electric/Goedecke have all of the information about the first LightRails completed by

---

[14] This issue <u>may</u> be moot however, because, in its response to the motion, the plaintiff <u>implies</u> that the claim is not based on the misappropriation. It states:

> The inducement of FitzGibbons by REV Birmingham to provide the design information is a critical element to the story, underscoring the lengths to which the Goedecke Defendants went to ensure the public still perceives the remaining underpasses as FitzGibbons, LLC LightRails projects.

(Doc. 36 at 7).  If this issue <u>is</u> moot, and the plaintiff wishes the court to treat this <u>argument</u> as if it were a <u>fact</u> alleged in the complaint (the complaint contains no such allegation), the court cannot do so. A complaint may not be amended by briefs in opposition to a motion to dismiss. *Fleming v. Dowdell*, 434 F. Supp. 2d 1138, 1148 (M.D. Ala. 2005) *aff'd*, 182 F. App'x 946 (11th Cir. 2006) (citing *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir.2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.") and *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir.1989) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss[.]")).

Even if the court <u>did</u> treat this "fact" as if it were part of the complaint, this "fact" does not show that any of the defendants used the information <u>to make others believe that the new projects were done by the plaintiff</u>.  While the "fact" <u>might</u> be "consistent" with such a purpose, the court is obliged to consider "more likely explanations."  *Ashcroft v. Iqbal*, 556 U.S. 662, 681, 129 S. Ct. 1937, 1951, 173 L. Ed. 2d 868 (2009). In this case, it is more likely that, <u>if</u> the information was given to Goedecke, it was because she was a member of the REV board. In that context, it would have been used possibly to evaluate costs and other aspects of the project <u>only as it related to whether REV should engage the plaintiff or not</u>. Regardless, assuming that REV gave the information to Goedecke and Mayer, there are no facts alleged that it did so in order that the project could be "passed off" <u>as the plaintiff's</u>.

FitzGibbons at the 18th Street underpass.

65. Based on information and belief, REV Birmingham, Mayer Electric and/or Goedecke will be duplicating the work of internationally-known light artist Fitzgibbons.

(Doc. 1 at 13). The defendants argue that these paragraphs allege only "copying" of the plaintiff's work, and that copying alone is not a violation of the Lanham Act. (Doc. 22 at 14; doc. 39 at 5-6). The plaintiff does not respond to this argument.

"In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29, 121 S. Ct. 1255, 1260, 149 L. Ed. 2d 164 (2001). "The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *Id.* at 34; *see also*, *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 511 (6th Cir. 2013) ("[T]rademark law does not prohibit copying as such; that is the province of copyrights and patents.") (*citing TrafFix Devices, Inc.*, 532 U.S. at 34).[15]

Although REV is responsible for hiring out new LightRails projects, the

---

[15] Also, 17 U.S.C. § 301 (the Copyright Act) broadly preempts "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright." 17 U.S.C.A. § 301(a). Further, even if copying was a violation of the Lanham Act, under the terms of the plaintiff's contract, the plaintiff gave REV the right "to make any and all reproductions or derivatives in whatever form," of the plaintiff's part of the project. (Doc. 1-3 at 7).

32

complaint does <u>not</u> say that more LightRails projects have been completed, or even contracted out. Further, there are no facts that Goedecke <u>did</u> anything other than: meet with the plaintiff (doc. 1 at ¶ 41), express that she was upset that the plaintiff did not purchase light fixtures from her company (doc. 1 at ¶ 42), and tell the plaintiff "[i]t looks like we're competitors," or words to that effect (doc. 1 at ¶ 42).  From these bare allegations, a plausible leap that new projects have been done, much less that Goedecke and Mayer were involved, cannot be made.[16]

---

[16] The complaint alleges that Rominger told Fitzgibbons that the plaintiff would not be hired for the remaining projects because REV was "going local." The complaint then states:

> Based upon information and belief, because [sic] Mayer Electric has an exclusive
> area distributorship in Alabama for ColorKinetics fixtures. Hence, going local
> means that Goedecke and/or Mayer Electric will be providing the ColorKinetics
> light fixtures for the remaining three LightRails projects.

(Doc. 1 at ¶ 48). This language also does not establish a plausible claim. First, the plaintiff is again merely speculating "upon information and belief" that Mayer has such an exclusive area distributorship. There are no <u>facts</u> in the complaint to support that conclusion. Second, as noted, the complaint does not allege that a contract has been awarded, or that any more work has been done. Therefore, even if Rominger has said that REV was "going local," and even if Mayer was REV's only option in that regard, there is no allegation that they actually <u>did</u> "go local."

The court notes that, in its response to the motion to dismiss, the plaintiff cites to evidence outside the pleadings in an attempt to show that Mayer has "'been selected to provide LED lighting fixtures for the 20th Street underpass lighting project,'" and "'Mayer . . . has since been selected as the lighting supplier for two additional REV Birmingham underpass lighting projects.'" (Doc. 36 at 6, n. 23) (quoting Goedecke and Mayer's response to interrogatories, doc. 40-2 at 9). Document 40-2 is the subject of REV's motion to strike. That motion will be **GRANTED**, and the court declines to consider this extrinsic evidence as "courts generally do not consider allegations outside of the complaint itself." *U.S. ex rel. Wilson v. Crestwood Healthcare, L.P.*, CV-11-S-3361-NE, 2012 WL 1886351 at *9 (N.D. Ala. May 18, 2012) (Smith, J.) (*citing St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir.2002)). Regardless, even if the court considered the evidence, it shows only that Mayer supplied lighting for the project, not that it somehow was passing off the new projects as the plaintiff's.

Also, the complaint does not provide any facts from which it could be determined that the work has, or will be, duplicated by any of the defendants. The complaint does not identify any specific features, other than lights which are placed in an underpass, which would be common to the work of both the plaintiff and these defendants. Further, even if the project was duplicated, there are no facts indicating that any of the defendants has represented to anyone that the plaintiff was involved, so that they could "pass off" the new projects as the plaintiff's.

### 4.      *There Are No Facts Alleged which Show how the New Work Could Be Confused with the Work of the Plaintiff.*

Count Two alleges:

66. As a result of the acts complained of hereinabove, REV Birmingham/Mayer Electric/Goedecke have created a false designation of origin, false or misleading description of fact, or a false or misleading representation of fact, which:

> (a) is likely to cause confusion, or to cause mistake, or to deceive;

> > (1) as to the affiliation, connection, or association of Defendants with FitzGibbons; or

> > (2) as to the origin, sponsorship or approval of FitzGibbons of the goods, services or commercial activities of Defendants.

34

67. Further, Defendants created a false or misleading representation that misrepresents the "LightRails" projects on the remaining three underpasses as being goods or services that originate with FitzGibbons.

68. More specifically, Defendants' acts are likely to cause confusion, to cause mistake or to deceive others into believing the remaining three "LightRails" projects for underpasses have an affiliation, connection or association with FitzGibbons, or the remaining three underpasses originate from, are sponsored by, or are approved by, FitzGibbons.

(Doc. 1 at 13). These conclusory statements also do not establish how there might be

confusion, and there are no other facts in the complaint which support these claims.[17]

### D.   Count Three – Unjust Enrichment (REV, Goedecke, and Mayer)

Count II alleges:

71. REV Birmingham has knowingly accepted the services performed by FitzGibbons. As a result of knowingly accepting the services provided by FitzGibbons, REV Birmingham accepted those services with knowledge of their value, and with the reasonable expectation to pay FitzGibbons for such services.

---

[17] The court also notes that the light sculptures at issue are a form of public art. There is no allegation that they are "sold" to the public, or that money is otherwise made off the 18th Street project or any new project. The second element of a passing off claim requires that the defendant made unauthorized use of the enforceable trademark "such that consumers were likely to confuse the two." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647-48 (11th Cir. 2007) (emphasis added) (internal citations omitted). With respect to this element, the Eleventh Circuit has stated that courts should consider "the similarity of the parties' retail outlets, trade channels, and customers ('consider[ing] where, how, and to whom the parties' products are sold')." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 648 (11th Cir. 2007). The plaintiff does not explain how a passing off claim under the Lanham Act could be had where the art is public and not "sold" to "consumers." Of course, since this issue was first raised in REV's reply brief (doc. 42 at 3), the plaintiff has not had a chance to respond to it. Accordingly, the court will not rule on the merits of this argument.

72. FitzGibbons had a reasonable expectation to be compensated for the services provided when REV Birmingham asked for and received information on other prospective "LightRails" projects. REV Birmingham knew that FitzGibbons expected to be paid for those services.

73. Further, Goedecke and/or Mayer Electric, by receiving such information through REV Birmingham, knew that FitzGibbons expected to be paid for his services.

74. As a result of Defendants accepting the services of FitzGibbons and the benefits thereof, Defendants accepted those services with knowledge that FitzGibbons should be paid a reasonable value for the services rendered.

(Doc. 1 at 14). In its response to the motion to dismiss, the plaintiff writes:

> The Alabama Supreme Court has stated:
>
> In order for a plaintiff to prevail on a claim of unjust enrichment, the plaintiff must show that "the ' "defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." ' *Dickinson v. Cosmos Broad. Co.*, 782 So.2d 260, 266 (Ala.2000) (quoting *Hancock–Hazlett Gen. Constr. Co. v. Trane Co.*, 499 So.2d 1385, 1387 (Ala.1986)).... 'The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another.' *Battles v. Atchison*, 545 So.2d 814, 815 (Ala.Civ.App.1989)."*Avis Rent A Car Sys., Inc. v. Heilman[,]* 876 So.2d 1111, 1123 (Ala.2003). " 'One is unjustly enriched if his retention of a benefit would be unjust.' " *Welch v. Montgomery Eye Physicians, P.C.*, 891 So.2d 837, 843 (Ala.2004) (quoting *Jordan v. Mitchell*, 705 So.2d 453, 458 (Ala.Civ.App.1997)). The retention of a benefit is unjust if" '(1) the donor of the benefit ... acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit ... engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the

absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been unjustly enriched.' " *Welch*, 891 So.2d at 843 (quoting *Jordan*, 705 So.2d at 458). The success or failure of an unjust-enrichment claim depends on the particular facts and circumstances of each case. *Heilman, supra.*

*Mantiply v. Mantiply*, 951 So. 2d 638, 654-55 (Ala. 2006);[18] *see also, Hardy v. Smith*, 2110726, 2013 WL 1490611 at * 3 (Ala. Civ. App. Apr. 12, 2013) *reh'g denied*, 2110726, 2013 WL 4291698 (Ala. Civ. App. Aug. 16, 2013) (same). "'To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation.'" *Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So. 3d 139, 145 (Ala. 2011) (quoting *Portofino*

---

[18] The plaintiff's responses (doc. 36 at note 27; doc. 40 at note 20) also cite to the following from *Mantiply*:

> Recovery on a theory of quantum meruit arises when a contract is implied. *Brannan & Guy, P.C. v. City of Montgomery*, 828 So.2d 914 (Ala.2002)."There are two kinds of implied contracts—those implied in fact and those implied in law. Contracts implied in law are more properly described as quasi or constructive contracts where the law fictitiously supplies the promise [to pay for the labor or services of another] to prevent a manifest injustice or unjust enrichment, etc."*Green v. Hospital Bldg. Auth. of Bessemer*, 294 Ala. 467, 470, 318 So.2d 701, 704 (1975). This Court has stated:"It is the settled law of this State that where one knowingly accepts services rendered by another, and the benefit and the result thereof, the law implies a promise on the part of the one accepting with knowledge the services rendered by another to pay the reasonable value of such services rendered."*Hendrix, Mohr & Yardley, Inc. v. City of Daphne*, 359 So.2d 792, 795 (Ala.1978).

*Mantiply*, 951 So. 2d at 656. See doc. 36 at 8, n. 27. The section referenced by the plaintiff specifically addressed only quantum meruit.

*Seaport Vill., LLC v. Welch,* 4 So.3d 1095, 1098 (Ala.2008)).

The "benefit" which the plaintiff claims it gave to REV was the preparation, and proposal, at REV's request for a LightRails project at the 14th Street underpass in Birmingham. (Doc. 1 at ¶ 37). The plaintiff alleges that

> Pursuant to that request, extensive measurements and photographs were made of the 14th Street underpass. FitzGibbons recommended interactive components for pedestrians at the 14th Streed underpass. Rominger and Chris Hatcher of REV Birmingham responded that this was a great idea. Therefore, FitzGibbons began to investigate an interactive component.
>
> 38. On July 10, 2013, Rominger asked FitzGibbons to do a proposal for the 14th Street underpass. Also, Rominger asked what particular fixtures to use, how much they would cost, and what kind of switches FitzGibbons would specify for the other "LightRails" projects, including the 14th Street underpass. FitzGibbons provided the requested information on the LED fixtures and continued research for appropriate switches for REV Birmingham.
>
> 39. Rominger, on behalf of REV Birmingham, also asked FitzGibbons for media contacts that would help REV Birmingham in their fundraising efforts. FitzGibbons provided REV Birmingham with the media contacts.

(Doc. 1 at 8-9). The defendants argue that the plaintiff cannot prevail because it had no reasonable expectation that it would be compensated.

The plaintiff's responses refer to the above allegations and argue that they "clearly" show that the plaintiff had a reasonable expectation that it would be paid for these services. (Doc. 36 at 9; doc. 40 at 6-7). The court does not agree. It is

undisputed that the plaintiff had <u>no</u> contract for the other projects. The one contract the plaintiff <u>did</u> have covered the 18th Street project alone. The allegations to which the plaintiff points show only that the plaintiff was asked to prepare a <u>proposal</u> for the other projects and did so. The Alabama Supreme Court has held that the plaintiff need not be compensated for "efforts in attempting to secure [a] contract," even if someone else gets the contract. *Utah Foam Products, Inc. v. Polytec, Inc.*, 584 So. 2d 1345, 1350-51 (Ala. 1991).

Further, the parties' course of dealing, as outlined elsewhere in the complaint, belies any inference that the plaintiff reasonably expected to be paid. The complaint states that before the plaintiff received the contract for the 18th Street project, Fitzgibbons reviewed the 18th Street underpass (doc. 1 at ¶ 14), inspected the four underpasses which comprise the entire LightRails project (doc. 1 at ¶17), and eventually sent a proposal for the 18th Street project (doc. 1 at ¶18). Only then did the plaintiff and REV enter into the contract for the 18th Street project. (Doc. 1 at ¶20). The contract into which the parties entered does not provide for payment for the work performed prior to the date on which it was executed. (Doc. 1-3 at 9-10). Further, the contract clearly states that the plaintiff "shall not commence . . . services until this Agreement is fully executed and [REV] issues a Notice to Commence Work" (doc. 1-3 at 9), language which implies that REV would not pay for work done before such

time. Finally, the complaint does not allege that the plaintiff expected to be paid, or, more importantly, <u>was</u> paid for the work it performed prior the date the 18th Street contract was executed.

The plaintiff points to no facts in the complaint establishing why it should have expected to be paid for the work done in an attempt to secure the new LightRails projects.

### E.   <u>Count Four – Civil Conspiracy (REV, Goedecke, and Mayer)</u>

Count Four reads:

> 77. As a result of the acts complained of herein above, all of the Defendants (REV Birmingham, Mayer Electric and/or Goedecke) have conspired together, and with others currently unknown, to commit a substantive tort against FitzGibbons. As a result, the Defendants have combined to do (a) something that is unlawful or (b) something that is lawful by an unlawful means.

> 78. Further, the acts of the co-conspirators (REV Birmingham, Mayer Electric and/or Goedecke) are attributable to each other.

> 79. As a result of the civil conspiracy, FitzGibbons has been damaged in an amount yet to be determined, but in excess of the jurisdictional minimums of this Court.

(Doc. 1 at 15). The allegation, without any facts in support, that the defendants have combined to do "something," simply does not rise to the pleading level required by

*Twombly* and *Iqbal*.[19]

### F.    The Plaintiff's Motion to Amend

As noted, the plaintiff asked for leave to amend in the event that this court found its complaint to be deficient. (Doc. 36 at 11; doc. 40 at 10). The Eleventh Circuit has noted:

> Under Federal Rule of Civil Procedure 15(a), a party may amend its pleading only with the opposing party's written consent or the court's leave, if a Federal Rule of Civil Procedure 12(b) motion has been filed. Fed.R.Civ.P. 15(a).  Although Rule 15(a)(2) instructs that leave of the court to amend pleadings should be given freely, when justice so requires; a district court may deny a motion to amend on "numerous grounds, such as undue delay, undue prejudice to the defendants, and futility of the amendment."

Mitchell v. Thompson, 12-12774, 2014 WL 1647350 (11th Cir. Apr. 25, 2014) (*quoting Carruthers v. BSA Adver., Inc.,* 357 F.3d 1213, 1218 (11th Cir.2004) (citation and internal quotation marks omitted in original)). The defendants do not object to (or even respond to) the motion to amend in their reply briefs. There has been no showing, nor is it clear from the pleadings or posture of this case, that the defendants would be prejudiced as a result of allowing the amendment. Further, the

---

[19] The defendants also argue that this claim is due to be dismissed because the other counts are due to be dismissed, and, absent an underlying tort, a conspiracy claim cannot lie. *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1124 (Ala. 2003) ("[L]iability for civil conspiracy rests upon the existence of an underlying wrong and if the underlying wrong provides no cause of action, then neither does the conspiracy."). The plaintiff agrees with this proposition. Because the court will allow the plaintiff to amend, this issue is moot.

case was filed relatively recently, in December of 2013. Finally, the court cannot say that an amendment would be futile. The plaintiff will be allowed to amend the complaint to add additional facts in support of its claim.

## IV.   CONCLUSION

Based on the foregoing, it is **ORDERED, ADJUDGED**, and **DECREED** as follows:

1.   REV's motion to strike "Exhibit A" to the plaintiff's brief opposition the motion to dismiss (doc. 42 at 2, 6-7) is **GRANTED**.

2.   The motion to dismiss filed by Mayer and Goedecke (doc. 22) is **DENIED** without prejudice;

3.   The motion to dismiss filed by REV (doc. 33) is **DENIED without prejudice**;

4.   The plaintiff's motions to amend the complaint (doc. 36 at 11; doc. 40 at 10) are **GRANTED**. **<u>The plaintiff shall file a complete amended complaint within 14 days which addresses the issues identified in this opinion.</u>**

**DONE** and **ORDERED** this 12th day of May, 2014.

**VIRGINIA EMERSON HOPKINS**
United States District Judge